200 N.J. Super. 560 (1985)
491 A.2d 1304
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
R.W.,[1] DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 1, 1985.
Decided April 23, 1985.
*562 Before Judges MORTON I. GREENBERG, O'BRIEN and GAYNOR.
Seymour Margulies argued the cause for appellant (Margulies, Margulies & Wind, attorneys; Seymour Margulies, of counsel; Clifford A. Herrington, on the brief).
Greta-Ann Gooden, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; Greta-Ann Gooden, of counsel and on the brief).
The opinion of the court was delivered by MORTON J. GREENBERG, P.J.A.D.
Defendant was indicted in Monmouth County for aggravated sexual assault (N.J.S.A. 2C:14-2(a)(1)), sexual assault (N.J.S.A. 2C:14-2(b)) and endangering the welfare of a three-year-old child (N.J.S.A. 2C:24-4(a)). The alleged victim, defendant's daughter, was born March 4, 1980. The time of the offenses was specified in the indictment as between March 29, 1983 and May 10, 1983. Prior to the trial on the State's motion over defendant's objection the indictment was amended by the court to fix the time of the offenses as between December 1, 1982 *563 and May 10, 1983 when the infant was between 33 and 38 months old. Defendant pleaded not guilty to the indictment.
Defendant served two pretrial motions which he conceived would aid him in ascertaining the capacity and credibility of the infant as a witness. The first filed November 3, 1983 asked that she be examined by a psychiatrist and psychologist he would retain to determine her competency as a witness. On November 16, 1983 defendant filed a supplemental motion asking that the infant be examined by a psychiatrist and psychologist retained by him to determine whether in light of her age she had sensory or mental defects relevant to an assessment of her credibility. The State objected to these motions and they were denied by order of December 2, 1983.
At pretrial proceedings on January 5, 1984 defendant made two motions. He asked for a postponement of the trial so he could obtain a psychiatric examination of the infant but this motion was denied. The second motion related to possible prejudice from a television movie. Defendant was aware of the scheduling for telecast on Monday, January 9 of a movie entitled "Something About Amelia," dealing with an incestuous relationship between a father and a teenage daughter. The program had been heavily advertised thus causing defendant to be concerned that jurors who watched the show might be prejudiced against him. Accordingly he moved for an instruction from the judge to the jurors that they not watch the show. The judge did not rule on the motion on January 5. The jury trial started on Monday, January 9, 1984 and was continued for three more days until January 12, 1984. At the outset of the proceedings on January 9, 1984 defendant renewed his request concerning "Something About Amelia." The judge denied the motion but indicated he would give the jury cautionary instructions concerning the show.
The evidence at the trial showed that defendant and the child's mother were married in 1977. Defendant's wife worked with autistic children and understood behavior modification. *564 The infant was raised in an open manner without inhibitions concerning her body and was thus taught the proper names for the anatomy. Defendant routinely bathed with her.
On December 1, 1982 defendant's wife left the marital home and moved to a different municipality. Defendant and his wife then orally agreed to share custody of the infant. According to defendant's wife, several months later the infant told her of conduct by defendant that we need not detail but which might constitute a sexual assault. The wife confronted defendant with this information but he denied it. In April 1983 defendant's wife took the child to Boston for a visit with the wife's sister. The sister testified at the trial and described being told by the infant of conduct by defendant that would indicate she may have been the victim of a sexual assault.
There were no eye witnesses to the offenses other than the infant nor was there any substantial physical evidence of the offenses though the wife did indicate that in May 1983 she noted the infant's vagina was red and swollen. A physical examination by a physician the following day showed no evidence of sexual abuse, a result which did not conclusively demonstrate there had been no abuse.
In May the matter was formally reported to the Division of Youth and Family Services and the police and on May 25 defendant was advised by his wife's lawyer he was initiating divorce proceedings. The indictment was returned June 14, 1983 and the following month defendant's wife filed the divorce complaint.
Obviously the infant's testimony was crucial. Defendant challenged her competency but the court allowed her to testify though the judge was understandably concerned about difficulties in obtaining her evidence. Consequently before she testified the judge in the presence of the jury told the infant that if what she said was "real" she would get ice cream. The infant then related acts constituting the sexual assaults. At the conclusion of her direct examination the infant refused to *565 testify without the ice cream. The judge then said to her in the presence of the jury that "I told you [her name] if you told real things and not pretend things, I would give you an ice cream, right?" After the witness said "Yes," the judge said "Okay. You're going to get it." She was then given the ice cream in the presence of the jury.
The infant then testified on cross-examination, apparently while eating the ice cream. When the testimony was completed the infant at the judge's direction came around to his bench and the following ensued in the presence of the jury.
THE COURT: Did you tell us everything that was real?
THE WITNESS: Yeah.
THE COURT: Are you sure?
THE WITNESS: Yeah.
THE COURT: For sure?
THE WITNESS: Uh-huh.
THE COURT: You didn't tell us no pretend stuff, right?
THE WITNESS: No.
THE COURT: Okay. Here, wait a minute. Take those. Goodbye.
The judge then in the presence of the jury gave the infant a lollipop and two cookies. After the jury was excused defendant unsuccessfully moved for a mistrial. At the conclusion of the State's case defendant's motion for dismissal of the aggravated sexual assault charge was granted. However this dismissal left the remaining charges standing.
Defendant testified in his own behalf. He denied the acts of sexual assault attributed to him and indicated that from the time of the separation there had been hostility between him and his wife.
Defendant was found guilty of sexual assault and endangering the welfare of a child.
Defendant made a motion for a new trial asserting among other bases that the court erred in failing to allow the psychological and psychiatric examinations, the judge vouched for and bolstered the credibility of the infant and the judge erred in failing to instruct the jury not to watch "Something About *566 Amelia." The materials submitted with the motion established the movie had been shown at the beginning of the trial on the evening of Monday, January 9 to an audience of 60 million people and was second only to "The Day After" in audience size for movies made for television. The show triggered a large number of calls to public agencies in various states including New Jersey concerned with child abuse. The program dealt with a father-daughter incestuous relationship described in the State's brief as follows:
Significantly, the program was not judgmental about the father's actions. In fact, the character was portrayed in such a manner as to invoke empathy instead of condemnation. Moreover, the episode did not even culminate in a criminal prosecution but rather in total reconciliation accompanied by psychiatric counselling for all the parties involved.
The motion for a new trial was denied.
Defendant was subsequently sentenced to seven years' imprisonment with a three-year period of parole ineligibility for the sexual assault. He received a concurrent term of three years for endangering the welfare of the infant. He was assessed two $25 penalties for the use of the Violent Crimes Compensation Board. This appeal followed.
Defendant raises the following contentions:
(1) The trial court erred in bolstering the credibility of the State's key witness, a three and three quarters years old child by indicating to the jury before her testimony that the witness would tell the truth and by indicating to the jury during and after the child's testimony that she had told the truth.
(2) The court erred in determining that the child was a competent witness against her father.
A. The trial court erred in denying defendant's motion for psychological and psychiatric tests to be conducted on the witness.
B. The witness had an inadequate understanding of the obligation to tell what was true.
C. The witness did not understand the difference between true and false.
D. Defendant was effectively denied his constitutional right to confront and cross-examine [child's name].
(3) The trial court erred in not taking action to eliminate the prejudice created by `Something About Amelia' a highly publicized treatment of an incestuous relationship between a father and a daughter aired on the A.B.C. television network during the trial.

*567 (4) The prosecutor's comments during his closing statement were harmfully prejudicial and should result in reversal.
A. It was error for the prosecutor to attack the credibility of defense counsel and for the court to deny a curative charge after interpreting a personal evaluation of the prosecutor's motive.
B. Error occurred when the prosecutor, in summation, suggested that he, as well as the jury, knew that defendant did things with his daughter and attacked the credibility of defendant's character witnesses by suggesting that they would not have testified as to defendant's good character if they had been aware of his criminal conduct.
(5) The trial court erred in admitting the hearsay testimony of the witness' aunt because the hearsay statement was not `fresh complaint' and its probative value clearly outweighed its prejudicial impact.
(6) The indictment, founded entirely upon hearsay testimony before the grand jury, was the product of prosecutorial misconduct and should be dismissed (not raised below).
(7) Defendant's conviction for sexual assault contrary to N.J.S.A. 2C:14-2(b) should merge into the conviction for endangering the welfare of a child contrary to N.J.S.A. 2C:24-4(a) because the latter constitutes the more specific offense and is part of the law designed to deal with family relations (not raised below).
(8) The trial court committed reversible error by permitting the State to amend the indictment to include conduct allegedly occurring four months prior to what was initially alleged in the indictment.
(9) The trial judge erred in his charge to the jury (not raised below).
A. The trial judge erred by instructing the jury on elements of engaging in sexual conduct with a minor for which there were no facts to support the instruction.
B. The court failed to adequately charge the intent necessary to commit sexual contact.
C. The court did not define `beyond a reasonable doubt'; there is a due process error.
(10) The trial court erred in denying defendant's motion for a new trial because the jury verdict was against the weight of the evidence.
(11) The judgment must be reversed because of the cumulative effect of the prejudicial errors.
(12) The sentence imposed upon defendant was clearly excessive and violative of the presumption created by the Legislature for first offenders.
We state at the outset of our discussion of the issues that we have not lost sight of the extraordinary difficulties faced by the prosecution in a case of this nature. Nor are the members of this panel, all of whom have served for many years as trial judges, oblivious to the difficulties of case management of the judge here. And most important of all we are aware of the *568 necessity of protecting the infant and punishing defendant if he is guilty. But no difficulty in prosecution or case management or need of the infant can justify this court in upholding a conviction if the proceedings leading to it are so fundamentally flawed as to be clearly capable of producing an unjust result. R. 2:10-2. Indeed if defendant is not guilty it is in the interest of the infant that he not be convicted.
Here we find three errors of such magnitude that they go to the heart of the fact finding process making the verdict unreliable and requiring defendant to be granted a new trial. These relate to the denial of the pretrial motions for psychiatric and psychological examinations, the endorsement of the infant's testimony by the judge and the failure of the judge to instruct the jury not to watch "Something About Amelia." Indeed each of the first two grounds in itself would require a new trial.
There is no question that the court had the power to order the examinations sought by defendant in his pretrial motions. State v. Franklin, 49 N.J. 286 (1967); State v. Butler, 27 N.J. 560, 600-601 (1958). However such power must be engaged in with great care and thus should be exercised only upon a substantial showing of need and justification. Ibid. A ruling on a motion for such examinations is discretionary in nature. Ibid.
Here the court determined that the infant was qualified as a witness, a ruling which we do not review. We observe, however, that while it is true an infant of tender years is not by reason of age along disqualified as a witness, see State In Interest of R.R., 79 N.J. 97, 113 (1979), there may be serious questions as to both the ability of an infant of tender years to recall the events and her testimonial capacity to narrate them. Thus we are convinced that fundamental fairness required that defendant be granted the examinations so he could develop evidence with respect to the infant's testimonial capacity. In State v. Butler, supra, 27 N.J. at 560 and State v. Franklin, supra, 49 N.J. at 286, the court determined that there was *569 substantial need for psychiatric examinations addressed to the testimonial capacity of proposed witnesses who had suffered from mental disorders. We think that the need is no less when the infant witness is of such tender years as the infant here.
Further even assuming that a court after a hearing pursuant to Evid.Rules 8 and 17 determined that a person has the capacity to be a witness, psychological and psychiatric testimony may be useful to a jury in determining the reliability of her testimony. In the recent case of United States v. Downing, 753 F.2d 1224 (3 Cir.1985) the court exhaustively considered the question of whether a defendant in a criminal case could call a psychologist as a witness to testify as to the reliability of eyewitness identifications. The court held that in some circumstances expert testimony on the reliability of eyewitness identifications can assist a jury in reaching a correct decision and would thus be admissible. Id. at 1231. In our view in some circumstances expert testimony similarly could aid a jury in determining what credibility to afford to the testimony of an infant of tender years. Defendant's pretrial motions for psychological and psychiatric examinations should therefore have been granted. Of course we do not now rule on whether the evidence developed from the examinations will be admissible at the new trial.
The second error relating to the bolstering and endorsing of the infant's testimony is of great magnitude as well. The judge in the presence of the jury used the words "real" and "pretend" to describe true or false testimony when the infant testified. As we have indicated the judge twice rewarded the infant in the presence of the jury for giving real as opposed to pretend testimony. We cannot understand why the jury was not excused when this was done. Certainly the infant could have been given the lollipop and cookies in chambers at the end of her testimony or, if given them in open court, the jury could have been excused. Further we see no reason why a similar procedure could not have been followed when the infant was *570 given the ice cream. Indeed on two occasions during the infant's testimony the jury was excused to the jury room. Here the judge unequivocally in the presence of the jury gave his opinion as to the accuracy of the most significant testimony in the case. This was a critical error. See State v. Walker, 33 N.J. 580, 595-596 (1960); State v. Corbo, 32 N.J. 273, 275-276 (1960); State v. Zamorsky, 159 N.J. Super. 273, 281-282 (App. Div. 1978), remanded 79 N.J. 485 (1979), adhered to in part and vacated in part 170 N.J. Super. 198 (App.Div. 1979), certif. den. 82 N.J. 287 (1980).
The judge attempted to overcome any prejudice to defendant by an instruction to the jury during his charge. He told the jury he gave the infant the ice cream so she would continue her testimony and he gave her the lollipop and cookies so she would leave the court with a positive memory of her experience there. He then unequivocally told the jury that his actions should not be considered as an indication of how the court viewed her credibility or reliability and he was not vouching for her as a witness. He emphasized that the issue of the infant's credibility was solely for determination by the jury.
While the judge did all he could to overcome the prejudice we are convinced that the error could not be cured by an instruction. In our review we think it appropriate to follow the standard announced by the Supreme Court in determining whether a mistrial should be granted when inadmissible prejudicial evidence is heard by the jury. Accordingly we consider whether the error was clearly capable of producing an unjust result and how strong and immediate a curative instruction was given. See State v. Winter, 96 N.J. 640, 647-649 (1984). Here the judge unnecessarily endorsed in the presence of the jury the most critical evidence in the case. The infant was the only eyewitness and the judge rewarded her in the presence of the jury for narrating circumstances that were real not pretend. It cannot be doubted that she was viewed by the jury with great sympathy. It was not sufficient to overcome the prejudice for *571 the jury to be told to ignore what the judge had done. A new trial is required.
The final issue which, at least when combined with the other errors, requires a new trial relates to the television show. Before the testimony started on January 9 the judge gave the jury a strong instruction that while they had a right to see "Something About Amelia" it did not pertain to this case and they were to decide the case on the basis of what they heard in the courtroom.
Ordinarily we would uphold the exercise of discretion by the judge in allowing the jury to see the movie inasmuch as it did not concern this particular case and defendant. See State v. Reynolds, 41 N.J. 163, 183-184 (1963), cert. den. 377 U.S. 1000, 84 S.Ct. 1930, 1934, 12 L.Ed.2d 1050 (1964). But here we will not. The circumstances of this case were emotionally charged. The jurors heard evidence from an infant concerning serious sexual offenses. During the trial they had the opportunity to watch a movie which showed that the result of establishing the sexual misconduct by the father was the reconciliation of the family with psychiatric counseling for the parties. In short the movie showed the positive result from a determination that there had been sexual abuse of a child by a father.
It is this positive result which concerns us. Naturally the jury was not formally concerned with the penalty aspect of this case. Rather its function was to determine whether or not defendant was guilty. But the results for defendant were far less happy than those for the father in the movie. The vice of allowing the jurors to see the show was the possibility that one or more of them may have thought the outcome could have been similar to that in the movie if defendant was convicted. We, of course, have no way of knowing whether the show in fact had any impact on the verdict but we do know that the jurors were not sequestered during the trial and thus had the *572 opportunity to see the movie. We are satisfied that the judge abused his discretion in refusing to instruct the jury not to watch the movie. The small imposition on the jurors of such an instruction pales in significance to the outcome of this case on defendant. We emphasize that ordinarily we would not reach this conclusion but the unusual circumstances of this case compel it.
In view of our result we need not discuss defendant's remaining points except for the validity of the indictment and its amendment. In particular we think that inasmuch as at the time of the retrial the infant will be older than at the original trial it would be pointless to consider now her capacity as a witness as of January 1984. Though he made no motion to dismiss the indictment defendant now argues that the judge committed plain error by failing to dismiss it for in defendant's view it was based on hearsay. He further asserts that the amendment of the indictment allowed the inclusion of additional illegal acts and was thus improper. These contentions do not require extended discussion. Certainly the motion to dismiss should have been made before the trial and thus we need not now consider it. R. 3:10-2. But in any event after our careful review of this matter we have concluded that both of these contentions are clearly without merit. R. 2:11-3(e)(2). See R. 3:7-4; State v. Stefanelli, 78 N.J. 418, 429 (1979); State v. Ferrante, 111 N.J. Super. 299, 304-305 (App.Div. 1970); State v. Kuske, 109 N.J. Super. 575, 585 (App.Div. 1970), certif. den. 56 N.J. 246 (1970).
The judgment of conviction and order denying a new trial are reversed and the matter is remanded to the Superior Court, Law Division, Monmouth County, for a new trial on the counts of sexual assault and endangering the welfare of a child. Defendant shall be allowed pretrial psychiatric and psychological testing of the infant subject to such reasonable conditions *573 and safeguards as the trial judge directs. We do not retain jurisdiction.
NOTES
[1] We are withholding use of the actual names in this case because of the infant.