# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4064-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

J.W.G.,[1]

     Defendant-Appellant.

_____

         Submitted January 3, 2022 – Decided March 3, 2022

         Before Judges Sumners and Vernoia.

         On appeal from the Superior Court of New Jersey, Law
         Division, Cumberland County, Indictment No. 17-02-
         0125.

         Joseph E. Krakora, Public Defender, attorney for
         appellant (Zachary G. Markarian, Assistant Deputy
         Public Defender, of counsel and on the brief).

---

[1] We use initials and pseudonyms to protect the privacy and preserve the confidentiality of the victims and this proceeding. N.J.S.A. 2A:82-46(a); R. 1:38-3(c)(9).

Jennifer Webb-McRae, Cumberland County Prosecutor, attorney for respondent (Andre R. Araujo, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury found defendant guilty of all eight charges against him: two counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1); two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); two counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1); and two counts of lewdness, N.J.S.A. 2C:14-4(b)(1). Following merger, the sixty-eight-year-old defendant was sentenced to consecutive forty-year prison terms with twenty-five years of parole ineligibility on the aggravated sexual assault offenses, concurrent to eight-year prison terms with four years of parole ineligibility on the sexual assault offenses.

Before us, defendant argues:

POINT I

THE COURT FAILED TO ESTABLISH THAT THE CHILD WITNESSES UNDERSTOOD THEIR DUTY TO TELL THE TRUTH AND WERE COMPETENT TO TESTIFY UNDER N.J.R.E. 601. (NOT RAISED BELOW).

POINT II

THE TRIAL JUDGE DISPLAYED PARTIALITY IN THE PRESENCE OF THE JURY BY SUGGESTING

2

A-4064-18

[ERICK]'S TESTIMONY THAT [DEFENDANT] HAD NOT TOUCHED HIM WAS UNTRUE AND COMMENDING THE CHILD WITNESSES AT THE CONCLUSION OF THEIR TESTIMONY. (NOT RAISED BELOW).

POINT III

THE COURT ERRED IN RUNNING [DEFENDANT'S] SENTENCES FOR AGGRAVATED SEXUAL ASSAULT CONSECUTIVE TO ONE ANOTHER FOR AN AGGREGATE SENTENCE ON EIGHTY YEARS WITH FIFTY YEARS OF PAROLE INELIGIBILITY WITHOUT ANALYSIS OF THE FACTORS SUPPORTING CONCURRENT SENTENCES.

We are unpersuaded that defendant's convictions should be reversed, but we reverse his sentence and remand for resentencing for the trial court to explain its reasons for imposing consecutive sentences as required by State v. Yarbough, 100 N.J. 627 (1985), the overall fairness of the sentences, and the real-time consequences of the sentences.

I

To give context to our ruling, we briefly summarize the trial testimony related to the investigation that led to the charges against defendant. When we later address the issues raised on appeal, it is only necessary to provide a limited discussion of the victims' trial testimony.

3

C.M. (Charles) and S.M. (Sara) are married and have three sons, C.M. D.M. (Danny), and E.M. (Erick). In September 2016, the family moved into a two-story home in Vineland with Sara's three uncles, one of whom was defendant. One evening, shortly after the move, Charles went to the bathroom to prepare Danny and Erick's bath and noticed defendant's bedroom door was closed. "[A]larm[ed]" by the "[un]common occurrence" of defendant's door being shut, Charles opened the door and saw defendant "on the floor alongside the bed with his pants down to his knees[,] masturbating in front of" Danny and Erick. Charles testified that a pornographic movie was also playing on the television. He said Danny, seven years old, and Erick, five years old, were fully clothed, but Erick's pants were unbuttoned.

After Charles told his sons to leave the room and verbally threatened defendant, he called for Sara. When she asked what was going on, defendant replied "you wouldn't understand this, you're a female. . . . [Erick and Danny were] curious." After Charles told her what happened, she immediately began packing and taking her sons out of the house "to get [them] away from [defendant]" and "that filthy environment."

When Charles asked his sons what happened with defendant, they did not say anything because, according to Charles, "they were upset with the situation."

4

Sara, however, testified that she did not ask her sons about what happened but Danny, "upset" and "look[ing] like he was on the verge of tears," said defendant and he performed oral sex on each other. Danny also told her that he and Erick "were watching a movie and that there was . . . a pretty girl in [it]" with "a toy."[2] He also said, "there w[ere] naked people in the movie and that they were doing stuff to each other." Erick was "completely . . . quiet sitting there, not moving, just looking straight ahead." When she asked Erick if defendant did anything to him, he "just sat there" and "said [']same as [Danny']."

Once his family left the house, Charles called the Vineland Police. That same evening, Charles and Sara went to the police station to give statements. The police subsequently took defendant to police headquarters.

After being Mirandized, defendant waived his right to counsel and gave a video-recorded statement that was played before the jury. He said that after he ate dinner, he assisted Danny with his math homework in defendant's room when Erick "wanted to come . . . and play." Defendant then began to describe a previous incident when the boys walked in on him using the bathroom and saw his penis. According to defendant, "they were curious" and "want[ed] to find

---

[2] Sara later clarified that it was Erick who told her that "there was a toy in the movie."

out why [his penis] was bigger than the[irs]. . . . And of course [he] said . . . as [they] get older [they,] to[o,] will have this opportunity." The boys then grabbed a tape measurer from the bureau in his room, insisting to "see how big [he was]." Defendant measured Danny and Erick's penises separately while they all sat on the edge of his bed. Charles then entered the room and demanded to know what was going on, while Danny and Erick's pants were open and defendant was pulling up his pants. At the conclusion of his statement, defendant was arrested.

Two days later, Danny and Erick were interviewed by Vineland Detective Cara Kahn, which was video-recorded and played before the jury. Using interview techniques that prioritized the children's comfort and allowed the use of both open-ended and leading questions, Kahn first spoke with Danny. After overcoming his reluctance to speak, Danny eventually disclosed there was "oral sex between [he] and [defendant], as well as . . . between [Erick] and [defendant]." Using anatomical dolls, Danny showed her the sex acts that were performed. He said, "[s]omething did happen bad" and defendant was in jail "for what he did[] bad," but that she "should ask [his] mom" about what it was because she "can say it right." Danny then related that while defendant was helping him with his math homework, Erick was "punching [defendant] in his wiener." Defendant told Erick "not too hard."

6

Danny did not want to verbalize where he was touched, so he was asked to indicate on a picture where he was touched; he pointed to the penis. He also stated that defendant had him and his brother watch "[s]omething really bad" on television that they "didn't want to watch" with naked "girl body parts [and] boy body parts." Danny stated this was the first time defendant had done something like this.

Kahn then spoke to Erick, finding his demeanor to be "a little more outgoing and forthcoming than [Danny]," despite having "a difficult time demonstrating with the [anatomical] dolls." Erick stated defendant was in jail because "he did a bad something like sex" and that he showed them movies displaying sex. He later asked Kahn, "[y]ou're not allowed to put your mouth on a penis, right?" Erick said that he and Danny performed oral sex on defendant and defendant performed oral sex on them. He also claimed defendant measured their "whole bod[ies]" with measuring tape.

## II

In Point I, defendant argues the trial court's competency examinations of Erick and Danny, seven and nine years old respectively at the time of trial, was deficient and warranted reversal of his convictions. He contends the court's examinations "were far less searching" than that upheld in State v. Bueso, 225

N.J. 193 (2016).  He asserts that in Bueso, our Supreme Court held that a trial court's examination of the child witness using hypotheticals could be "minimally sufficient" but needed to be "thorough and detailed."  225 N.J. at 214.

Defendant maintains Danny's examination "was not adequate to establish his competency, particularly after [he] initially indicated he did not . . . understand the difference between the truth and a lie."  Acknowledging Erick's examination "was somewhat more detailed," defendant contends it was still inadequate because it "depended almost entirely on leading questions and the court never allowed [Erick] to demonstrate his understanding of the difference between the truth and a lie in the context of a hypothetical," nor did the court "provide[] [him] a hypothetical scenario in which he could show he knew the difference between the truth and a lie in context."

Because defendant did not object to the court's examinations and finding that the victims were competent, he must show the admission of their testimony was "plain error clearly capable of producing an unjust result."  State v. Bunch, 180 N.J. 534, 541 (2004) (quoting State v. Afanador, 151 N.J. 41, 54 (1997)); R. 2:10-2; see also Bueso, 225 N.J. at 203 (determining "we review the trial court's competency determination for plain error" where there is no objection to

a competency ruling). We are not convinced the court's competency rulings were plain error.

N.J.R.E. 601 addresses the competency of witnesses and states:

> Every person is competent to be a witness unless (a) the court finds that the proposed witness is incapable of expression so as to be understood by the court and any jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) as otherwise provided by these rules or by law.

It is fundamental that "[b]efore testifying a witness shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by law." N.J.R.E. 603. In the case of a child, "a preliminary inquiry is undertaken to determine whether a child is competent to testify at a criminal trial." Bueso, 225 N.J. at 196. The court is obliged to assure the child understands the duty to testify truthfully. See id. 204-05; State v. G.C., 188 N.J. 118, 131-34 (2006). A court has the discretion to pose leading questions that may be used in the examination of a child witness in situations where the child is "hesitant, evasive or reluctant." Bueso, 225 N.J. at 207 (quoting State v. Smith, 158 N.J. 376, 390 (1999)). Claims to disqualify a witness "must be strictly construed against exclusion and in favor of admitting any relevant testimony the witness may offer." Id. at 204 (citing G.C., 188 N.J. at 132).

Similar to the competency examination in <u>Bueso</u>, the trial court's assessments of Danny and Erick's competency to testify were "minimally sufficient."  <u>Bueso</u>, 225 N.J. at 212.  Indeed, Danny told the court that he did not know the difference between "telling the truth and telling a lie."    His response, however, was suitably addressed by the court when it presented a hypothetical asking him what the consequences were of lying to his mother about not cleaning up a mess he made despite telling her that he did.  He answered that lying to his mother would result in him "get[ting] hit."  The court then asked him if he, at that moment, understood the distinction between "telling the truth and not telling the truth," to which he responded that he did.

Seeking additional confirmation from Danny, the court asked him if knew "[w]hat [would] happen if [he] d[id]n't tell the truth," and he replied that he did not know.  Yet, without further questioning from the court, Danny, drawing upon his reply to the initial hypothetical, expressed a consequence that made sense to him, which he provided earlier, stating, "[m]ostly I get hit."  Inferring what he meant by getting hit, the court asked him if he understood "that if [he] d[id]n't tell the truth[,] [he] c[ould] get in trouble" and that he must answer questions truthfully "in everything [he said]," to which he answered "Yeah."

Based on the court's colloquy with Danny, we are satisfied with its determination that he was competent to testify, and thus it should not be disturbed. Without additional prompting or inquiry from the court, Danny acknowledged that not telling the truth would result in unpleasant consequences, which he equated with being physically disciplined. This is akin to <u>Bueso</u>, where the Court upheld the trial court's competency ruling because the child witness, five years old when the alleged sexual assault occurred and seven years old at the time of trial, "understood that 'bad things' would follow if a lie were told in court." <u>Bueso</u>, 225 N.J. at 212-213. Thus, the court here was similarly correct that Danny was competent to testify.

As for Erick, the following colloquy occurred:

> THE COURT: And do you know the difference between the truth and a lie?
>
> [ERICK]: (No audible response)
>
> THE COURT: You have to tell me. Do you know the difference [between] the truth and a lie?
>
> [ERICK]: Yes.
>
> THE COURT: What happens when you don't tell the truth?
>
> [ERICK]: You lie.
>
> THE COURT: And what happens when you lie?

[ERICK]:  You stay in jail.

THE COURT:  You stay in jail. . . . [I]s it good to lie?

[ERICK]:  No.

THE COURT:  Okay.  So you understand it is not good to lie, correct?

[ERICK]:  (No audible response)

THE COURT:  [I]s that a yes?

[ERICK]:  Yes.

THE COURT:  Okay.  So you understand whatever you're telling us here today is going to be the truth, correct?

[ERICK]:  (No audible response)

THE COURT:  Is that yes?

[ERICK]:  (No audible response)

THE COURT:  You have to tell me.  Can you tell me yes?

[ERICK]:  Yes.

Based on Erick's unequivocal responses, he knew the difference between telling the truth and lying.  His answers were clearly articulated and demonstrated his understanding of telling the truth without the need for leading questions or a hypothetical to assess.  See id. 225 N.J. at 212 ("Subject to the

discretion of the trial judge, who must carefully monitor the examination to ensure that the child's answers are his or her own, leading questions may be used in a competency inquiry.").

In sum, under the standard of N.J.R.E. 601, there was no plain error in the court's determination that Danny and Erick were competent witnesses. The court properly exercised its discretion by permitting them to testify at defendant's trial.

## III

In Point II, defendant, relying on State v. R.W., 200 N.J. Super. 560 (App. Div. 1985) and State v. Michaels, 264 N.J. Super. 579 (App. Div. 1993), argues the trial court "repeatedly displayed partiality in the presence of the jury by intervening in the prosecution's questioning of [Erick] and praising both [Danny] and [Erick] at the conclusion of their testimony." The court told Erick that "[n]o one is going to be upset with you or be mad about anything if you just tell us what happened." Defendant asserts this suggested to the jury that Erick would not lie. After Danny and Erick concluded their testimony, the court told them both that they "did a great job." Defendant argues the court's praise before the jury intimated they were truthful and, thereby, deprived him of a fair trial warranting vacation of his convictions. Because defendant did not object to any

13

of the court's comments, we must consider whether they constituted plain error. Bunch, 180 N.J. at 541; R. 2:10-2.

Defendant's reliance on R.W. and Michaels is misplaced. In R.W., this court reversed the defendant's convictions for aggravated sexual assault, sexual assault, and endangering the welfare of a three-year-old child. The defendant was granted a new trial because the trial judge "bolster[ed] and endors[ed]" the testimony of a child regarding the defendant's misconduct when, in the presence of the jury, he gave her ice cream for continuing her testimony, and a lollipop and two cookies when she concluded her testimony.[3] 200 N.J. Super. at 565-66, 569. We reasoned that since "[t]he infant was the only eyewitness and the judge rewarded her in the presence of the jury for narrating circumstances that were real not pretend[,]" there was no "doubt[] that she was viewed by the jury with great sympathy." Id. at 570. We found reversible error even though the judge "told the jury he gave the infant the ice cream so she would continue her testimony and he gave her the lollipop and cookies so she would leave the court with a positive memory of her experience there." Ibid. We held the judge's

_____

[3] This argument was one of three errors raised by the defendant "of such magnitude that they go to the heart of the fact finding process making the verdict unreliable and requiring defendant to be granted a new trial." R.W., 200 N.J. Super. at 568. We determined each by "itself would require a new trial." Ibid.

error by giving treats to the witness was not curable by instructing "the jury that his actions should not be considered as an indication of how [he] viewed her credibility or reliability and he was not vouching for her as a witness," stressing "the issue of the infant's credibility was solely for determination by the jury." Ibid.

In Michaels, the defendant was convicted on 115 counts of sexual offenses involving twenty children who were in a daycare where she worked. 264 N.J. Super. at 585. We concluded that "impartiality was lost" in the trial when the judge, "in his zeal to make the children feel at ease so that their testimony might be obtained," "played ball with the children, held them on his lap and knee at times, whispered in their ears and had them do the same, and encouraged and complimented them," all in view of the jury. 264 N.J. Super. at 615. We emphasized the "the judge [needed] to be impartial in an adversary proceeding." Ibid.

The situation here is a far cry from what occurred in both R.W. and Michaels. At the conclusion of Danny's testimony, the court told him "great job . . . buddy" and released him to go "back outside with mommy and daddy [so he] c[ould] go home." The court also told him to "be good," "do well in school," and asked if he "get[s] good grades in school." Danny replied that he "already

15

[had] four," to which the judge responded, "God bless you, good job, buddy." We do not conclude the court's comments "unnecessarily endorsed in the presence of the jury the most critical evidence in the case," the testimony of the child witness, R.W., 200 N.J. Super. at 570, nor did its remarks "fail[] to recognize that he could be perceived as crossing the line between an impartial judge and the prosecution," Michaels, 264 N.J. Super. at 615. The comments offered assurance and calm, without crossing the line to show impartially regarding Danny's testimony. Thus, no plain error occurred.

As for Erick, we have concern about the court's comments to him. Erick testified that there was sexual contact between defendant and his brother, but when asked by the prosecutor "what happened with [defendant] [and] with [him]," he could not remember. The court interjected, telling him "it's okay to tell us. No one is going to be upset with you or be mad about anything if you just tell us what happened." Erick repeatedly denied there was any sexual contact with defendant, contradicting his statement to the police. While it is understandable that a seven-year-old Erick was reticent about discussing his sexual contact with defendant, the court's attempt to alleviate his nervousness improperly conveyed to the jury that he was not being truthful when he testified that nothing happened to him. Nevertheless, we find no manifest injustice in

the court's comments. Erick was not the only witness against defendant as there was admissible evidence in the form of the video-recorded police statements and his mother and brother's testimony that there was sexual contact between him and defendant. In short, the error was harmless.

IV

As noted, defendant was sentenced to two consecutive forty-years prison terms with twenty-five years of parole ineligibility for two counts of first-degree aggravated sexual assault. In Point III, he argues a remand for resentencing is required because the court imposed consecutive sentences without conducting the well-settled analysis mandated by Yarbough. He argues "several Yarbough factors . . . would have weighed heavily in favor of running J.G.'s sentences concurrently." His arguments have merit.

"[Our] review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We consider whether the trial court has made findings of fact grounded in "reasonably credible evidence[,]" whether the factfinder applied "correct legal principles in exercising . . . discretion," and whether "application of the facts to the law [has resulted in] such a clear error of judgment that it shocks the judicial conscience." State v. Roth, 95 N.J. 334, 363-64 (1984) (citations omitted). We

A-4064-18

review a trial judge's findings as to aggravating and mitigating factors to determine whether the factors are based on competent, credible evidence in the record.  Id. at 364.  "To facilitate meaningful appellate review, trial judges must explain how they arrived at a particular sentence."  State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Fuentes, 217 N.J. 57, 74 (2014); R. 3:21-4(g) [subsequently amended and now R. 3:21-4(h)] (requiring the judge to state reasons for imposing the sentence, including the factual basis for finding aggravating or mitigating factors affecting the sentence)).

Pursuant to N.J.S.A. 2C:44-5(a), when a defendant receives multiple sentences of imprisonment "for more than one offense, . . . such multiple sentences shall run concurrently or consecutively as the court determines at the time of sentence."  A trial court must apply the following guidelines when determining whether to impose concurrent or consecutive sentences:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.][4]

[Yarbough, 100 N.J. at 643-44 (footnote omitted).]

The Yarbough guidelines leave "a fair degree of discretion in the sentencing courts." State v. Carey, 168 N.J. 413, 427 (2001). "[A] sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences," id. at 427-28, but "the reasons for

---

[4] Guideline six was superseded by a 1993 amendment to N.J.S.A. 2C:44-5(a), which provides "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses." L. 1993, c. 223, § 1.

imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision," State v. Miller, 205 N.J. 109, 129 (2011). When a trial court imposes a consecutive sentence, "[t]he focus should be on the fairness of the overall sentence." State v. Abdullah, 184 N.J. 497, 515 (2005) (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)).

At sentencing, the court did not sufficiently discuss or weigh the Yarbough factors. In its reasoning, the court imposed consecutive sentences because "the[re] were . . . multiple victims who [were] independently victimized by . . . defendant. The [c]ourt also takes into consideration that the [convictions] for which this sentence [is] being imposed are numerous as there [were] eight in total." This does not sufficiently explain the imposition of consecutive sentences, the overall fairness of the sentences, and the real-time consequences of the sentences. We do not consider defendant's arguments supporting concurrent sentences; that is the trial court's role on remand.

Affirmed in part and remanded in part for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

20                                                                          A-4064-18