902 A.2d 1174

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. G.C., DEFENDANT–RESPONDENT.

Argued April 3, 2006—Decided July 24, 2006.

*Frank Muroski,* Deputy Attorney General, argued the cause for appellant (*Zulima V. Farber,* Attorney General of New Jersey, attorney).

*Alison S. Perrone,* Designated Counsel, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

Justice RIVERA–SOTO delivered the opinion of the Court.

The competence of a witness to testify resides at the core of all contested judicial proceedings. In this appeal we must determine what is required in order to declare a child sexual abuse victim competent to testify.

We reaffirm our settled law, that the determination of a witness' competence to testify resides in the sound discretion of the trial court, and hold that there was no abuse of discretion in the trial court's determination that the child witness here was competent. We also reaffirm the provisions of our Evidence Rules that presume that every person is competent to testify unless, among other things, "the proposed witness is incapable of understanding the duty to tell the truth[.]" *N.J.R.E.* 601(b). We further hold

that the provisions of *N.J.R.E.* 603 requiring an oath, affirmation or declaration to tell the truth under penalty of law are included within *N.J.R.E.* 601's requirement that a competent witness understand the duty to testify truthfully.

## I.

### A.

The relevant facts are straightforward. At the time of their separation in late 1999/early 2000, defendant G.C.[1] and his estranged wife Elizabeth were the parents of two young daughters, Doris (then age one year and five months) and her younger sister Kate (then an infant). When they separated, defendant returned to his father's home and Elizabeth and her two daughters returned to her mother's home, where Elizabeth's grandmother (the girls' great-grandmother) also lived. Elizabeth retained custody of the children. As of January 2002, when Doris was approximately three years and five months old, and Kate was approximately two years old, defendant and Elizabeth agreed that defendant could visit his daughters on Sundays, from 1:00 p.m. until 8:00 p.m. In practice, defendant would go to Elizabeth's family home, retrieve his daughters, and take them to his aunt's house

---

[1] This appeal arises from defendant's conviction for sexual abuse of his minor daughter. In order to protect privacy concerns, defendant is referred to by his initials and all other members of defendant's family, including his daughter, are referred to by pseudonyms. *N.J.S.A.* 2A:1B–1f(1) ("The name, address, and identity of a victim or a defendant [in a child sexual abuse case] shall not appear on the complaint or any other public record[.]"); *N.J.S.A.* 2A:82–46 (same as to victims of child sexual abuse). *See, e.g., State v. G.S.,* 278 *N.J.Super.* 151, 151 n. 1, 650 *A.2d* 819 (App.Div.1994), *rev'd on other grounds,* 145 *N.J.* 460, 678 *A.2d* 1092 (1996) ("Because this case involves an alleged sexual assault upon defendant's minor child, the defendant and all minor children are identified only by their initials."); *State v. Bowen,* 269 *N.J.Super.* 203, 204 n. 1, 634 *A.2d* 1371 (App.Div.1993) ("To protect the privacy interests of the minor child victim, initials have been used for the name of the child and her mother, the co-defendant."); *In re Maraziti,* 233 *N.J.Super.* 488, 488 n. 1, 559 *A.2d* 447 (App.Div.1989) ("Since the victims of the alleged sexual assaults committed by defendant are his minor daughters, he is referred to by his initials only.").

for the day, where they would play with their cousins until it was time to return home.

After the Sunday visitations started, Elizabeth noticed a change in Doris. According to her mother, Doris's "attitude got stronger." After the fourth or fifth visitation on February 3, 2002, Doris awoke in the middle of the night, crying and saying "don't touch me, leave me alone." Elizabeth sought to comfort her daughter and, based on Doris's cries, asked if anyone was touching her. Doris did not respond, but immediately went back to sleep. Those events repeated themselves later that same night.

The next day Elizabeth discussed Doris's nocturnal outbursts with a visiting nurse. The nurse suggested that Elizabeth question Doris during the daytime and ask whether anyone was touching her. However, when Elizabeth broached the subject with Doris the following day, she appeared scared and would not answer. Elizabeth persisted, reassuring Doris that she did not have to be scared. Doris then stated that defendant was touching her vagina; Doris did not use the word "vagina" but, instead, she used an ethnic slang term for "vagina" her mother had taught her. Elizabeth then repeated to her mother what Doris had just told her. Elizabeth's mother met with Doris alone and asked her to describe what her father had done to her. Once Doris did so, Elizabeth's mother asked Elizabeth to join them, but to bring a doll with her. Elizabeth and her mother gave the doll to Doris and asked her to show them where her father had touched her. In response, Doris mimicked a rubbing motion over the doll's vaginal area.

In the meanwhile, the visiting nurse contacted the Division of Youth & Family Services (DYFS) and notified DYFS of what Elizabeth had told her earlier that day. That same night, Peter Yzekwu,[2] a DYFS caseworker, telephoned Elizabeth and, two days

---

[2] Although both the *Rule* 104 hearing and trial transcripts refer to Peter Yzekwu as "Peter Nzekwu," the trial court, denying defendant's motion for a

later, on February 7, 2002, he went to Doris's home, where he spoke separately with Elizabeth, her mother, and Doris. Yzekwu specifically asked Doris why she was waking up in the middle of the night screaming, and Doris explained it was because defendant "was touching her private part[,]" again using the term her mother had taught her for her vagina. In his conversation with Doris, Yzekwu used a diagram of a female doll and, in order to focus Doris on the difference between appropriate and inappropriate touching, he asked her about "good touch" versus "bad touch" areas of the body. With those instructions, he asked Doris to identify different parts of the body. When Yzekwu pointed to the vaginal area on the diagram, Doris explained that it was a "bad touch" area and that it was there that her father had touched her. After that interview, Yzekwu transported Doris to the hospital for a physical examination and referred the matter to the County Prosecutor's Office. Doris's physical examination revealed nothing remarkable.

Investigator Lisa Collins was assigned to lead this investigation. On February 8, 2002, the day following Yzekwu's interview of Doris, Collins videotaped an interview with Doris. In respect of her descriptions of her father touching her vaginal area, Doris's statements in the videotaped interview were consistent with what she had told her mother, her grandmother, and Yzekwu. Doris also explained that her father had touched her with his genitalia, and that he had also touched her buttocks.

On February 20, 2002, Collins interviewed defendant. After defendant was advised of, acknowledged, and waived in writing his *Miranda*[3] rights, defendant denied that he had inappropriately touched his daughter. Collins's inquiries regarding that denial led to defendant's admission that he had rubbed Doris's vagina with his hand, but he claimed that it was in connection with wiping her

---

new trial, spelled out the surname as "Y-z-e-k-w-u." For purposes of this opinion, we have adopted the spelling placed in the record by the trial court.

[3] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

clean after she had used the bathroom. Collins persisted and asked if defendant had inserted his finger into Doris's vagina. Defendant first admitted he had done so accidentally. After additional questioning by Collins, defendant later retracted that explanation, admitted that he had inserted his finger into Doris's vagina, that it was not the result of an accident, and that he knew what he was doing at the time. At Collins's request, defendant agreed to provide an audiotaped statement, where he admitted that he "wiped [Doris] with some toilet tissue and [his] finger went inside of her." Once the audiotaped interview was concluded, defendant was arrested.

The grand jury charged defendant with first-degree aggravated sexual assault, in violation of *N.J.S.A.* 2C:14–2a, second-degree sexual assault, in violation of *N.J.S.A.* 2C:14–2b, and second-degree endangering the welfare of a child, in violation of *N.J.S.A.* 2C:24–4a.

## B.

On August 19, 2003, the day before defendant's trial started, the trial court heard several pre-trial applications, including the State's application, pursuant to the "tender years" exception to the hearsay rule, *N.J.R.E.* 803(c)(27), to admit Doris's hearsay statements about what defendant did to her. That led to the following colloquy between the trial court and defense counsel:

[DEFENSE COUNSEL]: I presume that at some point in time the Court is going to determine the competency of the young—

THE COURT: That's what the tender years hearing is all about. It's not competency.

[DEFENSE COUNSEL]: Another side of that coin.

The trial court then conducted a hearing pursuant to *Rule* 104 [4] on the admissibility of Doris's four hearsay statements under the

---

[4] *N.J.R.E.* 104(a) provides in relevant part that "[w]hen ... the admissibility of evidence ... is subject to a condition, and the fulfillment of the condition is at issue, that issue is to be determined by the judge.... The judge may hear and determine such matters out of the presence or hearing of the jury."

"tender years" exception to the hearsay rule.[5]  At that hearing, the State offered the testimony of four witnesses, Collins, Yzekwu, Elizabeth, and Elizabeth's mother, all of whom testified consistent with the events described above.  In addition, the State played the videotape of Collins's interview of Doris.  After considering the arguments of counsel, the trial court ruled that "the State may use the four statements that were referred to in the arguments of the State" because the court was "satisfied that the indicia of reliability is strong here, that there is no partisanship on the part of the interview[er], and that the interviewer has an excellent ability to recall."

After the jury was empanelled and trial commenced, the State offered the testimony of Yzekwu, Collins, Elizabeth, Doris and a pediatrician.  Yzekwu, Collins and Elizabeth testified consistent with their prior statements.  The qualifications of the pediatrician as an expert were not challenged and, without objection, she opined that, although the physical examination of Doris at the hospital disclosed an absence of trauma, the absence of trauma in these circumstances does not foreclose the presence of an assault. When Doris was called to testify, however, defense counsel specifically requested a separate determination that Doris was competent to testify.  Noting that, as of the time of trial, Doris was five years old, the trial court explained that it viewed defendant's application as "making certain that this witness can understand the difference between the truth and a lie."

Calling Doris to the stand outside the presence of the jury, the following questions and answers ensued:

> THE COURT: Well, let me—let me ask you this, [Doris]. Is it good or bad to tell a lie?
> [DORIS]: Not good.

---

[5] These were, in chronological order, Doris's statement to her mother following the February 3, 2002 visitation with defendant (February 5, 2002); Doris's statement to her grandmother later that same day; Doris's statement to Yzekwu, the DYFS worker, two days later (February 7, 2002); and Doris's statement to Collins, the Prosecutor's Office Investigator (February 8, 2002).

THE COURT: It's not good to tell a lie. Okay. Is it good or bad to tell the truth?

[DORIS]: It's good. It's good to tell the truth.

Excusing Doris from the courtroom, the trial court inquired of counsel concerning Doris's ability to distinguish between the obligation to tell the truth and the consequences of telling a lie. Defense counsel responded, "[w]e don't know whether she has any idea what consequences there are if a lie is told or whether she knows how important that is." Recalling Doris to the stand produced the following:

THE COURT: Now, before when you came in and we talked a little bit, I asked you if it was good to tell the truth. Do you remember that?

[DORIS]: (Nods.)

THE COURT: And I asked you about telling a lie. Do you remember that?

[DORIS]: (Nods.)

THE COURT: Okay. Now, in a little while we're going to have some people [the jury] sitting over there in these seats. Okay? Not like him. Other kinds of people. Dressed in regular clothes, not like him. Do you understand?

[DORIS]: (Nods.)

THE COURT: Now, when those people sit here, and they're all real nice, they want to hear you talk. Okay?

[DORIS]: (Nods.)

THE COURT: Do you understand that?

[DORIS]: (Nods.)

THE COURT: Good. You're nodding your head yes.

When you talk to them, are you going to tell the truth or are you going to tell a lie?

[DORIS]: I'm not going to tell the lie. I will tell the truth.

THE COURT: Okay. That's what we want you to do. Okay?

[DORIS]: (Nods.)

THE COURT: Are you going to tell the truth?

[DORIS]: (Nods.)

THE COURT: The witness is nodding her head yes. Okay. Very good.

The trial court overruled defendant's objections to Doris's competence as a witness. Addressing directly the requirements of *N.J.R.E.* 603 that "[b]efore testifying a witness shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by law[,]" the trial court inquired of the State, the proponent of Doris as a witness, "[h]ow do you

propose that we deal with her in terms of administering an oath?" The prosecutor first suggested that Doris should be sworn in. As an alternative, the prosecutor requested that "[i]f you don't want to place her hand on the Bible, at least have her raise [her] right hand and ask if she's going to tell the truth and the whole truth." The trial court rejected those alternatives, concluding that it was "satisfied that the young lady understands that she is to tell the truth here." Instead, once the jury was seated and in lieu of an oath, the trial court asked Doris the following questions and elicited the following answers:

THE COURT: [Doris, the prosecutor] is going to ask you some questions. You know that, right?

[DORIS]: Yes

THE COURT: And then some other people might ask you some questions. You know that?

[DORIS]: Yes.

THE COURT: Okay. And when you answer the questions, are you going to tell the truth or are you going—

[DORIS]: Yes.

THE COURT: Or are you going to tell a lie? Are you going to tell the truth?

[DORIS]: Yeah.

THE COURT: Are you going to tell a lie?

[DORIS]: No.

The trial court concluded that it "consider[ed] the witness to have been sworn and qualified to present testimony."

Once the prosecution rested, defendant presented his case. It consisted of the testimony of his aunt, two female cousins who were daughters of that aunt and who lived in the same household, and a male cousin. All testified that they were members of a close-knit family; that the family gathered at the aunt's home every Sunday; that the aunt's home is where defendant would bring his daughters during his Sunday visitations; that defendant would not take his daughters to the bathroom but, instead, would ask a female relative to do so; and that none witnessed any untoward behavior between defendant and his daughters. In addition, defendant testified and steadfastly denied all of the allegations made against him.

The jury convicted defendant of all charges, and defendant was sentenced to an aggregate term of ten years imprisonment, subject to an eight and one-half years parole disqualifier pursuant to the No Early Release Act, *N.J.S.A.* 2C:43–7.2, and additional fines and penalties.

On appeal, defendant raised six points. Among those, defendant argued that the trial court abused its discretion in allowing into evidence Doris's hearsay statements under the "tender years" exception to the hearsay rule, *N.J.R.E.* 803(c)(27), and that the trial court erred as a matter of law in determining that Doris was competent to testify. Addressing those points, the Appellate Division concluded that, although Doris's hearsay statements were properly admitted into evidence, it was "convinced from [its] review of the record that the inquiry into [Doris's] understanding of her duty to tell the truth was insufficient and that [Doris's] trial testimony created the need for further inquiry into the trustworthiness of her out-of-court statements." As a result, the panel was "constrained to reverse and remand for a new trial." [6]

Focusing exclusively on Doris's competence to testify, the Appellate Division explained that "merely knowing the difference between the truth and a lie is not sufficient. *N.J.R.E.* 601 requires in part that the witness must be capable of 'understanding the duty' to tell the truth." According to the panel, because Doris "was never asked if she knew of the consequences of telling a lie or what might happen to her if she told a lie[,]" it concluded that "it was never established whether [Doris] understood the duty to tell the truth, *N.J.R.E.* 601, or whether she was aware that she could be punished for telling a lie, *N.J.R.E.* 603." As the Appellate Division saw it, the analysis in respect of the competence of a child witness requires a two-step process. First, "before permitting a child's testimony, there must be some expres-

---

[6] The Appellate Division also rejected defendant's claim that the trial court improperly admitted the videotape of Doris's statement to Collins. Because it held that the trial court's inquiry into Doris's competence was insufficient, however, the panel did not address defendant's additional arguments.

sion from the witness that it is understood that some form of punishment could result from telling a lie on the stand." In that construct, once that standard is met, the emphasis shifts: "After determining that a child witness knows the difference between truth and falsehood, the next inquiry must necessarily focus on whether the child understands the moral duty to tell the truth, not whether the child will tell the truth." Under the Appellate Division's reasoning, "[a] trial judge is required to inquire into an infant's understanding of the duty to speak the truth in order to determine whether the child possesses moral responsibility[,] that is, a consciousness of the duty to tell the truth." (internal quotation marks omitted).

Thus, the panel held that the trial court "erred in not inquiring further, as urged by defendant, into [Doris's] capacity to understand the duty to tell the truth and the consequences of telling a lie[.]" For that reason, the Appellate Division concluded that "the failure to do so resulted in a manifest injustice, which requires us to reverse defendant's conviction and remand for a new trial."

We granted the State's petition for certification, *State v. G.C.*, 185 *N.J.* 297, 884 *A.*2d 1266 (2005), and, for the reasons that follow, we reverse the judgment of the Appellate Division, reinstate defendant's convictions, and remand the cause to the Appellate Division for consideration of defendant's remaining arguments.

## II.

The State argues that the Appellate Division erroneously concluded that Doris's competence to testify had not been proven because there was an insufficient inquiry into Doris's "understanding of her duty to be truthful and the consequences for telling a lie." In the State's view, the panel's decision cannot be sustained for two reasons. The State principally argues that the trial court properly exercised its discretion when it determined both that Doris understood the need for truthfulness and that she was willing to testify truthfully. According to the State, that finding is entitled to deference and, in the absence of an abuse of discretion,

must stand. In the alternative, the State notes that, because Doris testified and was subjected to cross-examination, any perceived shortcomings in Doris's qualifications as a competent witness did not have the capacity to lead to an unjust result. On the whole, the State asserts that a greater good was served here: the trial court correctly allowed Doris to testify and, in so doing, afforded defendant the benefit of a full and complete cross-examination, something defendant would have been unable to do in respect of Doris's properly admitted hearsay statements.

Defendant argues that the trial court's inquiry into Doris's competence was deficient because the trial court did not expressly question Doris in two specific areas: that she understood that she had a duty to tell the truth, and that she understood the consequences of lying. Defendant further argues that the absence of a full inquiry into Doris's competence infringed on defendant's cross-examination rights and ultimately undermined the reliability of the fact-finding process.

### III.

We consider the discrete issue of whether the Appellate Division erred when it concluded that the trial court failed to "establish[ ] whether [the child sexual assault victim] understood the duty to tell the truth, *N.J.R.E.* 601, or whether she was aware that she could be punished for telling a lie, *N.J.R.E.* 603." We emphasize that this challenge addresses only Doris's trial testimony and does not implicate the admissibility of her hearsay statements. As noted earlier, the Appellate Division held that Doris's hearsay statements to her mother, grandmother, the DYFS worker and the police investigator were admissible under the "tender years" exception to the hearsay rule. *N.J.R.E.* 803(c)(27). *Supra,* 188 *N.J.* at 124–25 n. 5, 128, 902 *A.*2d at 1177 n. 5, 1179 (2006). We have not been called on to review that holding.[7]

---

[7] Defendant did not cross-petition on this point. Thus, the hearsay statements were and remain admissible under the "tender years" exception to the hearsay rule. *N.J.R.E.* 803(c)(27).

A.

In order to be competent to testify, a witness "should have sufficient capacity to observe, recollect and communicate with respect to the matters about which he is called to testify, and to understand the nature and obligations of an oath[,]" *State v. Butler*, 27 *N.J.* 560, 602, 143 *A.*2d 530 (1958) (citing *State v. Mohr*, 99 *N.J.L.* 124, 127, 122 *A.* 837 (E. & A.1923)). Focusing specifically on the last element of witness competence, the requirement of an oath or oath substitute was classically stated almost thirty years ago: "it is clear that all prospective witnesses—including infants—must be sworn or affirmed prior to the giving of testimony." *In re R.R.*, 79 *N.J.* 97, 108, 398 *A.*2d 76 (1979). However, as *In re R.R.* recognizes, "[a]lthough *Evid. R.* 18 [now recodified as *N.J.R.E.* 603] requires that all prospective witnesses be sworn or affirmed, neither that nor any other rule specifies any particular form to which an oath must adhere." *Ibid.* Hewing to the modern view of the oath "primarily as a vehicle to remind the witness that he has a special obligation to speak the truth in court[,]" *id.* at 110, 398 *A.*2d 76, we subscribe to the principle that

> [a]ny ceremony which obtains from an infant a commitment to comply with this [special] obligation [to speak the truth in court] on pain of future punishment of any kind constitutes an acceptable common law, and hence a valid *Evid. R.* 18, oath. It is not necessary that an infant mouth the traditional litany nor comprehend its legal significance. Trial judges are therefore invested with a certain amount of discretion to tailor the traditional litany to fit the circumstances of a particular case.
>
> [*Id.* at 111, 398 *A.*2d 76.]

We accept something different in the way of an oath from child victim witnesses for two reasons. First, "any holding to the contrary would virtually preclude children from testifying against their assailants." *Ibid.* Second, we are confident that "allowing departures from the traditional oath will not result in convictions based upon the word of infants incapable of understanding the difference between right and wrong. Infants must still satisfy the competency requirements of *Evid. R.* 17 [now recodified as *N.J.R.E.* 601] in order to testify." *Ibid.*

More recently, we observed that "[t]he general rule is that all persons are qualified to testify as witnesses, so long as they are competent to do so[, and that t]he determination of whether a person is competent to serve as a witness lies within the discretion of the court." *State v. R.W.*, 104 *N.J.* 14, 19, 514 *A.*2d 1287 (1986) (citations omitted). Reaffirming the rule of *In re R.R.*, we further explained that "[t]he broad reliance on the discretion of the trial court and the standards governing individual competency determinations does not change when the proposed witness is youthful." *Id.* at 20, 514 *A.*2d 1287. Specifically, we made clear that *In re R.R.* stands for the proposition that "disqualification is warranted only if the trial judge finds that the proposed witness is incapable of expressing himself or herself concerning the matter so as to be understood by the judge and jury or the proposed witness is incapable of understanding the duty of a witness to tell the truth." *Ibid.* (citation omitted).

These standards inform and guide our decision. As to the former standard, the colloquy between the trial court and Doris demonstrates, and defendant effectively concedes, that Doris was clearly capable of expressing herself in a manner that was understandable. Thus, only one question remains: whether Doris was "incapable of understanding the duty of a witness to tell the truth."

■ We reject the Appellate Division's conclusion that the trial court "erred in not inquiring further, as urged by defendant, into [Doris's] capacity to understand the duty to tell the truth and the consequences of telling a lie[.]" We reaffirm the competence requirements codified in our evidence rules:

> Every person is competent to be a witness unless (a) the judge finds that the proposed witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) except as otherwise provided by [the rules of evidence] or by law. [*N.J.R.E.* 601.]

■ In that context, the clearly preferred procedure would have entailed the use of an oath or oath substitute that acknowledged

both the obligation to testify truthfully and that the failure to do so could result in adverse consequences. However, we find that, taken as a whole, the inquiry conducted by the trial court of a five-year-old witness concerning events that transpired a year and a half earlier was sufficient to support the trial court's exercise of discretion in determining Doris's competence. The trial court tailored Doris's competence *voir dire* to focus on whether Doris understood her duty to tell the truth. That duty necessarily implicates the consequences arising as a result of a failure to comply with the duty. Ultimately, the trial court determined that she did understand that duty. Again, "[t]he determination of whether a person is competent to be a witness lies within the sound discretion of the trial judge." *State v. Savage*, 120 *N.J.* 594, 632, 577 *A.*2d 455 (1990) (citing *State v. R.W.*, 104 *N.J.* 14, 19, 514 *A.*2d 1287 (1986); *In re R.R.*, 79 *N.J.* 97, 398 *A.*2d 76 (1979)). We see no reason to disturb that exercise of discretion here.

### B.

■ We also reject the implication that the requirements of an oath or affirmation described in *N.J.R.E.* 603 exist independently of the general rule of competence set forth in *N.J.R.E.* 601. They do not. *Rule* 601 reflects "the basic policy of our law that every person is qualified and compellable to be a witness and to give relevant and competent evidence at a trial." *State v. Briley*, 53 *N.J.* 498, 506, 251 *A.*2d 442 (1969) (citation omitted). Stated differently, our "system of justice ... has established as a general rule that all persons should be qualified to testify, and that disqualification should be the exception[.]" *Germann v. Matriss*, 55 *N.J.* 193, 217, 260 *A.*2d 825 (1970). As a result, *Rule* 601 focuses on whether "a prospective witness [has] the ability to understand questions and to frame and express intelligent answers...." *In re R.R.*, 79 *N.J.* 97, 114, 398 *A.*2d 76 (1979) (citation and internal quotation marks omitted).

■ *Rule* 603 describes some, but not all, of the means in which a witness can satisfy the last element of witness competence: the

requisite assurances that he will communicate his memory of the perception with fidelity. No particular form of oath, statement or litany is required. So long as the witness understands the duty to tell the truth, *Rule* 603's requirements are met. *Rule* 603 is not intended as a self-contained rule of competence, but instead as a non-exclusive list of how assurances can be had that the witness understands the duty to testify truthfully imposed under *Rule* 601(b). *See, e.g., State v. Zamorsky,* 170 *N.J.Super.* 198, 202, 406 *A.*2d 192 (App.Div.1979) (*per curiam*), *certif. denied,* 82 *N.J.* 287, 412 *A.*2d 793, *cert. denied,* 449 *U.S.* 861, 101 *S.Ct.* 172, 66 *L.Ed.*2d 78 (1980) (holding that factual basis must present "a sufficient commitment by the child to tell the truth on pain of some kind of punishment, so that . . . the failure to administer the oath formally [does] not, in the circumstances, constitute reversible error.").

## IV.

The judgment of the Appellate Division is reversed, defendant's convictions are reinstated, and the cause is remanded to the Appellate Division for consideration of defendant's remaining arguments.[8]

Justice WALLACE, JR., concurring.

I write separately because, in my view, we need not reach the issue whether the oath requirement is an element of witness competence, as expressed by the majority. Because I agree with the trial court's findings that the competency requirement and the oath requirement were satisfied, I concur in the result.

---

[8] Defendant's remaining arguments on appeal addressed both his convictions and sentence. They are that (1) the verdict constitutes a manifest denial of justice, based on defendant's "strong[] disagree[ment] with the trial court's assessment of the evidence[;]" (2) "the cumulative effect of all of the above errors deprived defendant of a fair trial[;]" and (3) in light of the trial court's finding that "the aggravating factors in this case are outweighed by the mitigating factors[,]" his sentence was excessive. We express no opinion in respect of these arguments.

This Court has long recognized that the determination of whether a person is competent to be a witness resides in the sound discretion of the trial court. *State v. Savage,* 120 *N.J.* 594, 632, 577 *A.*2d 455 (1990); *State v. R.W.,* 104 *N.J.* 14, 19, 514 *A.*2d 1287 (1986); *In re R.R.,* 79 *N.J.* 97, 113, 398 *A.*2d 76 (1979). The court's decision may be disturbed only if it clearly lacks support in the record. *In re R.R., supra,* 79 *N.J.* at 113, 398 *A.*2d 76.

A hearing should be conducted to determine if any of the bases for disqualification set forth in *N.J.R.E.* 601 are present. That rule provides:

Every person is competent to be a witness unless (a) the judge finds that the proposed witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) except as otherwise provided by these rules or by law.

[*N.J.R.E.* 601.]

"The purpose of the trial judge's inquiry into an infant's understanding of the duty to speak the truth is that of determining whether the child possesses 'moral responsibility'—that is, a consciousness of the duty to tell the truth." *In re R.R., supra,* 79 *N.J.* at 113, 398 *A.*2d 76. It is for the court to ascertain if "the child understands (a) the difference between right and wrong; (b) that to tell the truth is 'right'; and (c) that he [or she] will be punished in some way should he [or she] lie to the court." *Id.* at 114, 398 *A.*2d 76.

Here, the record supports the trial court's conclusions that Doris was capable of expression concerning the questions asked and understood the duty to speak the truth. In response to the trial court's inquiries, Doris replied that it is "not good" to tell a lie and that "[i]t's good to tell the truth." She acknowledged that she was "not going to tell [a] lie" and would "tell the truth." Although the trial court neglected to ask Doris if she understood that she might be punished if she did not tell the truth, I do not find that shortcoming fatal. The trial court's questions were minimally sufficient for it to find that Doris's various expressions demonstrated that she would tell the truth and would not tell a lie.

I find no abuse of discretion in the trial court's conclusion that Doris was competent to be a witness.

Similarly, I conclude that the requirement that Doris take an oath was satisfied. *N.J.R.E.* 603 provides that "[b]efore testifying a witness shall be required to take an oath or make an affirmation or declaration to tell the truth under the penalty provided by law." "[T]he main purpose underlying the modern oath requirement is that of reminding the witness that he [or she] has a special obligation to speak the truth in court." *In re R.R., supra,* 79 *N.J.* at 111, 398 *A.*2d 76. No particular form of oath is required. *Ibid.* The traditional oath requires the witness swear or affirm that he or she will "tell the truth, the whole truth, and nothing but the truth." It does not make reference to any punishment for failure to tell the truth, but punishment is implied.

In the present case, when the issue of the oath was broached, the prosecutor suggested that the court have Doris raise her right hand and ask her "if she's going to tell the truth and the whole truth." That was a reasonable suggestion, but the trial court chose a different approach. Instead, the trial court explained to Doris that the prosecutor and defense counsel would ask her questions and inquired whether, in answering their questions, she was "going to tell the truth" or "going to tell a lie." Doris replied "Yeah," that she would tell the truth, and "No," that she would not tell a lie.

The trial court fashioned a fair approach to giving the oath to Doris and was satisfied with Doris's responses. The responses evidenced that the witness would tell the truth. That is sufficient for the trial court to find that the witness was properly under oath.

In sum, I find no abuse of discretion in the trial court's litany of questions to Doris, and based on Doris's responses, its findings that she was competent to testify and properly under oath.

Chief Justice PORITZ and Justice LONG join in this opinion.

*For reversal, reinstatement and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE, and RIVERA–SOTO—7.

*Opposed*—None.