**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2536-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KAREEM D. WHITE,

     Defendant-Appellant.

_____

Argued May 18, 2022 – Decided July 29, 2022

Before Judges Gilson, Gooden Brown and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 18-06-0334.

John P. Flynn, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John P. Flynn, on the briefs).

Jeffrey C. McElwee, Jr., Assistant Prosecutor, argued the cause for respondent (Angelo J. Onofri, Mercer County Prosecutor, attorney; Monica Martini, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Kareem D. White of second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1). The primary evidence against defendant consisted of video footage from surveillance cameras. Because the detective who narrated the videos made statements that were beyond a neutral narration and invaded the province of the jury, we reverse defendant's conviction and remand for a new trial.

I.

We discern the facts from the evidence presented at defendant's trial. Just before 5:00 p.m. on December 17, 2017, a shooting was reported near apartment buildings located on Oakland Street in Trenton. Police officers responded but were unable to locate any witnesses or evidence that a shooting had occurred.

The following morning, members of the Mercer County Shooting Response Team (Response Team) canvassed the area of 160 to 166 Oakland Street. Detective Kevin Reading, a member of the Response Team, viewed and obtained copies of surveillance video footage from two different cameras located on apartment buildings at 160 and 166 Oakland Street. The video footage from December 17, 2017, at approximately 4:57 p.m., showed that two men had approached a parked car, had raised their arms, and had pointed objects towards the car. The video also showed a third man had gotten out of the car,

initially appeared to take cover behind the car, had raised his arm, and had extended an object from which a flash of light appeared. The two men then ran away from the car, with one of them briefly taking cover behind a tree. The man who had gotten out of the car, thereafter, ran down the sidewalk and out of view of the cameras.

It appears that when the cameras were recording that incident, the sun had already set because what was captured on the videos was not clearly illuminated. Accordingly, the three individuals depicted on the video could not be seen clearly. Moreover, the video footage of the man who had exited the car was not clear enough to identify what the man looked like, nor did the video footage clearly depict how he was dressed.

Using the video footage, members of the Response Team were able to locate eight 9-millimeter shell casings in an area where one of the men depicted in the video footage had hidden behind a tree. They also found two .45 caliber shell casings nearby on the street.

Law enforcement personnel also obtained video footage from surveillance cameras located at a deli across the street from where the police believed the shooting had occurred. That video footage did not capture the shooting but depicted several men standing outside the deli approximately an hour before the

3

shooting was reported. When Detective Reading reviewed the deli video footage, he recognized defendant. Reading later explained that he had seen defendant approximately six to twelve times before December 17, 2017. Reading also showed the deli video footage to Trenton Police Department officers Nathan Bolognini and Anthony Manzo. Bolognini and Manzo also recognized defendant from previous encounters that they had had with him.

Based on the video footage from the apartment buildings, the police identified the car from which the man had exited as a Plymouth Sundance. The police located the Plymouth Sundance parked on Oakland Street the day after the reported shooting and a search of the Sundance disclosed a bullet fragment. Through further investigation, the police learned that defendant and his half-brother, Euquan Jackson, co-owned the Plymouth Sundance.

In June 2018, defendant was indicted for ten crimes, including six counts of aggravated assault and four weapons offenses. Before trial, the State dismissed all charges except the charge of second-degree certain persons not to possess a weapon.

At the beginning of the trial, defendant moved in limine to preclude the State from narrating the video footage and to bar Reading, Bolognini, and Manzo from identifying him. After conducting a Rule 104 hearing outside the presence

of the jury, the trial court denied both motions. The court ruled that the State could have Reading narrate the videos. In making that ruling, the trial court explained on the record:

> We talked a little about the narration and as I advised counsel, I think allowing - - and I think that the State is proffering Reading as going to nar - - not narrate blow-by-blow the video. But once the video is shown, orientating the jury as to what they're looking at, what direction they're looking and then pointing out, not referring to the Defendant on the video where he doesn't recognize him as the Defendant but where he might recognize one or two or more people shooting. But he can - - can't say with any certainty what they're doing but he can indicate that it appears this person is extending his arm. It appears he's got an object in his hand. You see a flash; things of that nature. And then on the deli video, whenever he makes the [identification], he can indicate that. And again, state - - letting the jury know where they're - - in what direction they're looking, because I think the car that's at issue is contained in both videos but different angles, things of that nature.

The court also ruled that Detective Reading could not state that any of the men depicted in the video footage were holding a firearm. Concerning the identification, the court ruled that Reading, Bolognini, and Manzo could identify defendant as a person they saw standing outside the deli.

5

At trial, the State offered into evidence several videos from the surveillance cameras on the apartment buildings and at the deli. After those videos were entered into evidence, Reading narrated the videos.

Before showing the footage from the apartment buildings, the assistant prosecutor asked Reading: "Now, what did you see when you viewed that footage?" Reading responded:

> I observed three individuals exchanging gunfire in front of that building. Two individuals were on foot and one individual was occupying a parked vehicle in front of the building.

Thereafter, as the jury was shown two video clips from two different security cameras depicting the alleged shooting, Reading narrated for the jury what he observed on those videos. At times, the State played portions of the video in slow motion, pausing at various frames, and Reading narrated what he saw depicted.

Initially, Reading identified a Plymouth Sundance parked in between an Oldsmobile Intrigue and a Hyundai Sonata. The State believed that the shooting was depicted on approximately fifteen seconds of the video footage. The State played those fifteen seconds in slow motion three times with Reading narrating the movements of the three people depicted each time.

6

Reading testified that the first person appearing in the footage walked towards the Sundance with his right hand in his pocket, removed his hand from his pocket holding an object, took a "wider stabilized stance," and "point[ed]" the object at the Sundance. Reading also stated that seconds later, the first person is seen "reacting and he's -- essentially, he's moving. He's being evasive, moving towards the left. . . . [His] right arm is up, pointing at the Sundance, still holding an object."

Reading stated that the second person in the footage appeared to be wearing a black hooded shirt with his hands in his pockets and he followed behind the first person. Reading then explained that the second person was "reacting. He is taking a low stance, a squatting stance, if you will, but he's staying low. He just reacted to something . . . . He's being evasive. He's moving right. He's placing himself behind a tree that is situated between him and the Plymouth Sundance." Reading then testified that the second person pointed his right arm in the direction of the Sundance and appeared to be holding an object.

Concerning the third person in the video, Reading testified that person got out of the driver's side of the Sundance and lowered himself behind the car. According to Reading, the third person then stood and began to raise his arm and that "after that individual raised his arms, that is a bright flash coming from

7

the area of his arms." The court then admitted into evidence a photograph taken from the video that depicted an individual near the car and a bright flash. Next, Reading was shown a photograph of the man running from the car; that photograph was admitted into evidence as State Exhibit 10. Reading acknowledged that he could not identify the third man based on the image. Nevertheless, Reading described the individual depicted in the photograph as an "African-American male, wearing a black cap, black long-sleeve hooded shirt. There's the light-colored, white like emblem on the left chest area, light-colored pants and black shoes."

The State then had Reading do a similar individual-by-individual narrative of the video clip taken from the second surveillance camera that showed a different angle of the incident.

Reading was then shown video footage from the cameras at the deli. Viewing the video clip taken approximately an hour before the alleged shooting, the assistant prosecutor asked Reading if he saw anyone on the footage matching the description he gave of the individual exiting the Sundance in State Exhibit 10. Reading answered yes and testified that he saw an African-American man wearing a black Nike sweatshirt, light-colored jeans, black sneakers, and a black mask that covered a portion of his face. Reading testified that the person

standing outside the deli appeared to be the same person who had exited the Plymouth Sundance during the incident.

Reading was then shown two different video clips from other cameras at the deli. Reading identified defendant as one of the men depicted in the videos. Reading was also shown five photographs taken from the video, and he testified that the individual depicted in those photographs was defendant. The photographs were admitted into evidence as State Exhibits 36 to 40. Reading testified that he was familiar with people in the neighborhood from prior investigations he had conducted with the Response Team. He explained that he had seen defendant approximately six to twelve times prior to investigating the incident on December 17, 2017. Reading also identified defendant in court.

Reading identified defendant in other video footage from inside and outside the deli. As part of that testimony, Reading stated that he observed the man he believed to be defendant walk across the street and get into the Plymouth Sundance at approximately 4:04 p.m. on December 17, 2017.

On cross-examination, Reading conceded that a cell phone, a camera, a mirror, or a cigarette lighter could have produced a flash or a little flame. On re-direct, Reading was allowed to opine that the flashes seen in the video were consistent with a muzzle flash from a firearm.

9

Bolognini and Manzo both testified at trial concerning the out-of-court identification of defendant from the video footage taken from the deli. Bolognini explained that he had spoken to defendant many times in the neighborhood. Manzo testified that he had been a police officer in Trenton for more than thirty years, had previously worked at the deli as a security guard, and knew defendant because defendant had frequented the deli. Bolognini and Manzo also identified defendant in court.

After conducting a Rule 104 hearing outside the presence of the jury, the trial court also allowed the State to present testimony about, and submit into evidence, a picture of Euquan Jackson. Defense counsel objected to that testimony and photograph, contending that the State had failed to produce the photograph before trial. The trial court rejected that argument.

After hearing the testimony and considering the evidence, the jury found defendant guilty of the one charge against him at trial: second-degree certain persons not to have a weapon. Thereafter, defendant was sentenced to eight years in prison with five years of parole ineligibility. He now appeals from his conviction and sentence.

II.

On appeal, defendant presents five issues for our consideration:

POINT I – THE DETECTIVE'S NARRATION OF SECURITY VIDEOS WAS IMPROPER UNDER N.J.R.E. 701 AND INFRINGED ON THE JURY'S ROLE TO DETERMINE WHETHER THE MAN EXITING THE PLYMOUTH SUNDANCE POSSESSED A GUN.

POINT II – THE REPEATED IDENTIFICATIONS OF [DEFENDANT] BY THREE OFFICERS CONSTITUTED NEEDLESSLY CUMULATIVE EVIDENCE UNDER N.J.R.E. 403 AND HAD THE CAPACITY TO UNFAIRLY SUGGEST THAT [DEFENDANT] WAS INVOLVED IN PREVIOUS SHOOTINGS.

POINT III – THE STATE'S CLEAR VIOLATION OF ITS OBLIGATION TO PROVIDE CONTINUING DISCOVERY, COUPLED WITH OBJECTED-TO PROSECUTORIAL MISCONDUCT IN SUMMATION EXPLOITING THIS VIOLATION, DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

A. The Photograph of Euquan Jackson Should have been Excluded Because the State Violated its Duty to Provide Continuing Discovery Under Rule 3:13-3 by Failing to Disclose the Photograph when it Was Obtained by the Prosecutor's Detective Prior to Trial.

B. The Unfair Surprise from this Discovery Violation, made Worse by Objected-To Prosecutorial Misconduct in Summation Denigrating the Defense, Requires the Reversal of [Defendant]'s Conviction.

POINT IV – THE CUMULATIVE EFFECT OF THE ABOVE ERRORS DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

11

POINT V – THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE LEGISLATURE HAS ENACTED A NEW MITIGATING FACTOR REGARDING YOUTH THAT APPLIES TO [DEFENDANT]'S CASE.

We need to reach only the first issue presented by defendant. Having reviewed the testimony and evidence at trial, we conclude that certain parts of the narration of the videos by Detective Reading were improper and inadmissible. In that regard, portions of Reading's narration were without evidentiary support, invaded the province of the jury, and violated N.J.R.E. 701. Those parts of Reading's narration were so prejudicial that they deprived defendant of a fair trial. Consequently, we are compelled to vacate defendant's conviction and remand for a new trial.

A. The Trial Court's Admission of the Narrative Testimony.

Defendant moved in limine to preclude any police officer from narrating the video footage. The trial court properly conducted a Rule 104 hearing outside the presence of the jury and ultimately determined that Reading could provide some narration. In making that ruling, the trial court gave some guidance on the scope of the narration but did not detail the specific questions and responses that would and would not be allowed.

12

"[T]he determination of whether a person is competent to be a witness lies within the sound discretion of the trial judge." State v. G.C., 188 N.J. 118, 133 (2006) (quoting State v. Savage, 120 N.J. 594, 632 (1990)). "[A] trial court's evidentiary rulings are entitled to deference absent a showing of an abuse of discretion, i.e., there has been a clear error of judgment." State v. Singh, 245 N.J. 1, 12-13 (2021) (alteration in original) (quoting State v. Nantambu, 221 N.J. 390, 402 (2015)).

B. The Law on the Scope of Permissible Narration of Video Footage.

Video footage that captures an incident, which is not witnessed in real time, presents a somewhat unique evidentiary issue: once authenticated, should the video simply be played for the jury, or can someone narrate to the jury what is depicted in the video? To date, the New Jersey Supreme Court has not delineated what is and what is not permissible narration. Instead, existing Supreme Court cases that discuss narration testimony have focused on the propriety of specific narrative comments rather than the general format of the testimony. See State v. Sanchez, 247 N.J. 450, 466-67 (2021); Singh, 245 N.J. at 19-20; see also State v. Lazo, 209 N.J. 9, 22-24 (2012). When the issue has arisen, the question has focused on whether a specific comment by the narrator is purely factual or is a lay opinion. See Singh, 245 N.J. at 14-15. Accordingly,

the Court has evaluated the admissibility of narrative testimony under N.J.R.E. 701. See Sanchez, 247 N.J. at 466; Singh, 245 N.J. at 14.

In Singh, the Court addressed lay opinion testimony relating to video surveillance recordings. The defendant in that case challenged testimony from a detective who had twice referred to the person shown in the surveillance video as "the defendant." Id. at 18. The detective further commented that the sneakers worn by the suspect in the surveillance video looked like sneakers found on defendant the night he was arrested. Id. at 19.

The Court began its analysis by examining the purpose and boundaries of N.J.R.E. 701, which provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> > (a)    is rationally based on the witness' perception; and
> >
> > (b)    will assist in understanding the witness' testimony or determining a fact in issue.

The Court in Singh determined that it was an error for the trial court to allow the detective to refer to the suspect in the video as "the defendant" but ultimately concluded that those fleeting references were harmless. Id. at 17. The Court also concluded that there was no error in allowing the detective to

14

testify that the sneakers he saw in the video were like the sneakers the defendant had been wearing on the night he was arrested. Id. at 17-19. The Court reasoned that although "the jury may have been able [on its own] to evaluate whether the sneakers were similar to those in the video[, that] does not mean that [the detective's] testimony was unhelpful. Nor does it mean that [the detective's] testimony usurped the jury's role in comparing the sneakers." Id. at 20.

In Sanchez, the Court focused on whether a parole officer could offer a lay opinion identifying the defendant as a suspect in a still-frame image taken from a surveillance video. 247 N.J. at 458. Specifically, the Court considered whether it was an improper lay opinion for a "parole officer, who had met with [the] defendant more than thirty times as she supervised him on parole, [to tell] a detective investigating a homicide and robbery that [the] defendant was the individual depicted in a photograph derived from surveillance video taken shortly after the crimes." Id. In analyzing that issue, the Court compiled a non-exhaustive list of four factors to consider in determining whether lay opinion testimony will assist the jury in a case. Id. at 473. Those factors include (1) "the nature, duration, and timing of the witness's contacts with the defendant"; (2) "if there has been a change in the defendant's appearance since the offense at issue"; (3) "whether there are additional witnesses available to identify the

defendant at trial"; and (4) "the quality of the photograph or video recording at issue." Id. at 470-73. The Court stressed that no single factor will be dispositive. Id. at 473-74 (citing Lazo, 209 N.J. at 20-24). The Court in Sanchez ultimately determined that the parole officer's testimony was based on her perceptions of having met with the defendant more than thirty times and, therefore, her testimony was admissible and helpful to the jury. Id. at 475.

This court recently considered the standard for determining if police video-narrated testimony was properly admitted. State v. Watson, ___ N.J. Super. ___, ___ (App. Div. 2022) (slip op. at 64-107). After reviewing existing relevant New Jersey Supreme Court precedent, we held there is no categorical, per se rule that prohibits video narration testimony. Watson, ___ N.J. Super. at ___ (slip op. at 65). "Rather, the critical fact-sensitive issue to be decided on a case-by-case, indeed, question-by-question basis is whether a specific narration comment is helpful to the jury and does not impermissibly express an opinion on guilt or on an ultimate issue for the jury to decide." Ibid.

In Watson, we distilled general principles related to lay witness opinion testimony and adapted those principles to the specific context of a "play-by-play" narration of video recordings. Id. at 70-71. We recognized certain principles that were already clearly established. For example, we pointed out

that existing case law made it "clear that it is impermissible for a police witness to testify at trial as to a defendant's guilt or an ultimate issue to be decided by the jury." Id. at 83. "Relatedly, the law also is clear that there are significant restrictions on when a police witness may offer a lay opinion on whether defendant is the person shown in a video recording or screenshot in cases where the identity of the culprit is at issue." Ibid. We pointed out that an objective description of what is depicted in a video will generally be admissible, but subjective commentary needs to be carefully analyzed. In that regard, we drew "a fundamental distinction between narration testimony that objectively describes an action or image on the screen (e.g., the robber used his elbow to open the door) and narration testimony that comments on the factual or legal significance of that action or image (e.g., the robber was careful not to leave fingerprints)." Id. at 89.

The critical inquiry in defining the scope of permissible video-narration testimony is the second prong of N.J.R.E. 701: "whether the narration testimony would be helpful to the jury by shedding light on the determination of a disputed factual issue." Id. at 92. "If the jury needs no assistance to fully understand the contents of the video, then narration commentary would tread upon the role of the jury under N.J.R.E. 701 analysis." Id. at 92-93.

Ultimately, in <u>Watson</u>, we identified six factors to guide trial courts in safeguarding the province of the jury from unwarranted intrusion by narration. <u>Id.</u> at 95. Those factors include (1) if the video-narration testimony would provide helpful background context; (2) if the testimony would explain the duration of the video and be focused on isolated events or circumstances; (3) if a narrative comment would pertain to a fact in dispute; (4) if a narrative comment would be based on an inference or deduction supported by other facts in evidence; (5) the clarity and resolution of the video recording; and (6) whether the narration testimony would be helpful in focusing the jury's attention if a video is complex or contains distracting images. <u>Id.</u> at 95-100.

C.   The Application of the Law to the Narration Provided by Detective Reading.

We hold that Reading overstepped the permissible bounds of video-narration in three areas of his testimony. Although defense counsel did not object to certain of Reading's comments, defense counsel had effectively preserved all objections by moving to preclude any narration of the videos. <u>See</u> <u>State v. Hernandez</u>, 334 N.J. Super. 264, 268 n.1 (App. Div. 2000), <u>aff'd as modified and remanded</u>, 170 N.J. 106 (2001); <u>R.</u> 1:7-2. Moreover, even if we were to apply a plain error standard of review, all the errors were "clearly capable of producing an unjust result." <u>R.</u> 2:10-2; <u>see also</u> <u>State v. R.K.</u>, 220

18                                                          <span>A-2536-18</span>

N.J. 444, 456 (2015) (explaining that an "error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached").

Our analysis is based in part on our review of the video footage. We typically defer to a trial court's fact findings, even where those findings are based solely on video that is equally available to the appellate court. State v. S.S., 229 N.J. 360, 379-81 (2017). Here, however, the trial court did not make findings of fact regarding what the videos depicted. We also note that there are no reasonable factual disputes concerning what the videos do and do not show.

Reading's narrative testimony violated N.J.R.E. 701 when he (1) introduced the video footage of the incident as depicting "three individuals exchanging gunfire"; (2) described the clothing worn by the person who had exited the Sundance and repeatedly stated that that person appeared to be the same person whom he identified as defendant in the videos from the deli; and (3) opined that the flashes seen in the video of the incident were consistent with flashes from the muzzle of a gun.

Initially, we place those three errors in context. The State presented no witness who had seen the alleged shooting incident. The primary evidence was video footage that was not monitored in real time. Reading and the jury had the

same source of knowledge regarding the incident: the videos. And the jury could see the same things on the videos that Reading observed.

To convict defendant as a person not to possess a weapon, the State had to prove beyond a reasonable doubt that (1) defendant was one of the persons depicted in the video of the incident; and (2) defendant possessed a gun during the incident. See N.J.S.A. 2C:39-7(b), (c); Model Jury Charges (Criminal), "Certain Persons Not To Have Any Firearms (N.J.S.A. 2C:39-7(b)(1))" (rev. Feb. 12, 2018).

The State's theory at trial was that all three individuals depicted in the video of the incident had handguns. If only the two individuals seen approaching the Sundance had guns, defendant could not be found guilty. Consequently, the shell casings and bullet fragment found after the alleged shooting did not establish defendant had a gun.

In that context, Reading's first statement that the video of the incident depicted "three individuals exchanging gunfire in front of the building" was inadmissible, subjective testimony that went beyond what is permitted under N.J.R.E. 701. The State conceded, as it had to, that the incident in the video was not clearly a shooting. Indeed, at the 104 hearing, the trial court expressly ruled that Reading could not state that the three individuals were holding guns.

20

Although a reasonable jury could view the videos and conclude that handguns had been fired, that was the ultimate factual question the jury had to decide. Reading's definitive characterization of the videos was not supported by anything other than his review of the video and his subjective conclusion that three individuals had exchanged gunfire.

Furthermore, Reading's subjective comment was not a fleeting comment that can be deemed harmless error. See Singh, 245 N.J. at 17-18. Reading's comment was made as an introduction to the videos of the incident. Accordingly, it set the stage for his detailed "play-by-play" narrative of the videos.

The second error was Reading's description of the person who had exited the Sundance. Reading candidly conceded that he could not identify that individual from the videos of the incident. Apparently, to get around that evidentiary gap, the assistant prosecutor asked Reading to describe the individual depicted in a still photograph taken from the video, which was marked as State Exhibit 10. Reading responded:

> Sure. An African-American male, wearing a black cap, black long-sleeve hooded shirt. There's the light-colored, white like emblem on the left chest area, light-colored pants and black shoes.

Even giving the State every favorable inference, an objective view of the photograph does not allow any reasonable person to make such a detailed description. The photograph was taken from the video that recorded events after sunset. Accordingly, the lighting on the person depicted in the photograph is not good. The photograph depicts a person on a sidewalk, but the figure is all dark. It is not clear that the individual is African American. There is what appears to be a white spot on the person's chest but calling it an "emblem" is a subjective characterization. Furthermore, the color of the individual's pants and shoes cannot be seen clearly. Although the pants may be lighter than the upper garment, testifying that the pants were "light-colored" is a subjective statement. Similarly testifying that the shoes were "black" is also a subjective statement given the video's lack of clarity and lighting. The critical flaw with Reading's description of the individual in the photograph is that Reading had no knowledge or information to support that description beyond what the jury itself could observe. Like the jury, he saw only the video footage and photograph; he did not witness the person exiting the Sundance.

The second error was compounded when Reading identified defendant in the video from the deli, described almost verbatim what defendant was wearing while in front of the deli, and then repeatedly testified that the person he

22

identified as defendant in front of the deli appeared to be the same person depicted in the video of the alleged shooting incident. Reading did just what the Supreme Court has held a police officer cannot do in narrating a video: he identified defendant as the person committing the crime based on a review of a surveillance video. See Singh, 245 N.J. at 15-16.

The second error was also not fleeting. Reading described what defendant was wearing while standing in front of the deli at least three times. Reading then repeatedly testified that that individual appeared to be the same person who exited the Sundance in the video of the alleged shooting incident.

We are not holding that Reading could not identify defendant from the deli video footage. The individual Reading identified as defendant can be clearly seen in the deli video footage and the photographs taken from that footage. We are holding, however, that the State improperly elicited testimony that directly linked Reading's identification of defendant from the deli videos to the person who exited the Sundance in the separate videos and photograph of the incident. Unlike the deli videos, the videos of the incident do not depict any of the individuals with sufficient clarity to enable someone to describe what those individuals looked like or what they were wearing.

Finally, the court erred in allowing Reading to opine that the flashes seen in the video of the incident were consistent with flashes from the muzzle of a gun. That testimony was clearly expert testimony under N.J.R.E. 702. Our Supreme Court recently held that police testimony was expert evidence where an officer renders an opinion to the jury based on the officer's training and experience, not his or her personal perception of the matter being explained. State v. Derry, 250 N.J. 611, 635-36 (2022). In deciding that case, the Court cited State v. Hyman, 451 N.J. Super. 429 (App. Div. 2017), where we concluded that a detective's "translation testimony" of slang and code words was expert testimony. Id. at 635 (quoting Hyman, 451 N.J. Super. at 448). In Hyman, the detective was asked repeatedly to render opinions based on "his training and experience and knowledge of [the] investigation." Id. at 30 (quoting Hyman, 451 N.J. Super. at 448).

Like the detective in Hyman, Reading was asked repeatedly to render opinions about the source of the flash on the video based on his training and experience, not his "personal perception and observation." Id. at 632 (quoting State v. McLean, 205 N.J. 438, 459 (2011)). Reading, however, was never identified as an expert and he did not prepare an expert report before trial. See id. at 634 (noting disclosure requirements for expert testimony under Rule

3:13(b)(1)(I)).  Accordingly, Reading's testimony exceeded anything permitted as a lay opinion under N.J.R.E. 701.  Id. at 636.

The State argues that Reading's opinion concerning the muzzle flash was admissible because the defense opened the door in cross-examining Reading. We disagree with that argument.  Moreover, we hold that the trial court abused its discretion in allowing the testimony.

"The 'opening the door' doctrine is 'a rule of expanded relevancy and authorizes admitting evidence which otherwise would have been irrelevant or inadmissible in order to respond to (1) admissible evidence that generates an issue, or (2) inadmissible evidence admitted by the court over objection.'"  State v. Prall, 231 N.J. 567, 582 (2018) (quoting State v. James, 144 N.J. 538, 554 (1996)).  The doctrine "permits 'a party to elicit otherwise inadmissible evidence when the opposing party has made unfair prejudicial use of related evidence'" and "operates to prevent a defendant from successfully excluding from the prosecution's case-in-chief inadmissible evidence and then selectively introducing pieces of this evidence for the defendant's own advantage, without allowing the prosecution to place the evidence in its proper context."  Id. at 582-83 (quoting James, 144 N.J. at 554).  "The doctrine is limited, however, by

weighing the probative value against the prejudicial nature of the evidence under N.J.R.E. 403." Id. at 583.

In narrating the videos of the incident on his direct examination, Reading commented on and pointed out to the jury that there were flashes of light. The trial court had previously ruled that Reading could not testify that those flashes were flashes from a handgun. On cross-examination, defense counsel asked Reading if those flashes could have come from a cell phone, a lighter, or a mirror reflecting light. That cross-examination did not open the door to allow Reading to then offer an opinion that the flashes were consistent with a flash from the muzzle of a gun.

In addition, the assistant prosecutor did not establish a basis for Reading to offer that opinion. Reading testified only that he was generally familiar with the flashes of certain weapons from his yearly training, which included firing his service weapon at night. Without knowing the type of weapon involved, Reading's opinion appears to be a net opinion. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011) (explaining that "an expert's bare opinion that has no support in factual evidence or similar data is a mere net opinion which is not admissible and may not be considered").

More critically, whatever probative value that testimony had was substantially outweighed by the undue prejudice it likely introduced. See N.J.R.E. 403; State v. Gonzalez, 249 N.J. 612, 635 (2022). The critical issue at trial was whether defendant had a gun. Reading's opinion that the flash of light seen when the individual who exited the Sundance raised his arm was consistent with the flash from the muzzle of a gun was highly prejudicial because it went to the ultimate issue and had little evidentiary value.

D.     The Cumulative Errors.

Each of the three errors we have identified in Reading's testimony was sufficiently harmful to warrant the reversal of his conviction. Cumulatively, the three errors were clearly harmful errors.

A defendant is not entitled to a "perfect trial" but is "entitled to a fair trial." State v. Weaver, 219 N.J. 131, 160 (2014) (citing State v. Wakefield, 190 N.J. 397, 537 (2007)). "[W]here any one of several errors assigned would not in itself be sufficient to warrant a reversal, [but] all of them taken together justify the conclusion that [the] defendant was not accorded a fair trial, it becomes the duty of [the court] to reverse." Id. at 155 (first alteration in original) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)).

As we have detailed, the three errors in Reading's narrative testimony were each reversible error. They also built upon one another and, in culmination, they deprived defendant of a fair trial.

E.    Defendant's Other Arguments.

Having concluded that defendant was deprived of a fair trial because of the inadmissible comments during Reading's narration of the videos, we need not reach defendant's other arguments. Nevertheless, because we are remanding for a new trial, we briefly comment on certain of those arguments and add a clarification about nay narration at the new trial.

At a new trial, the trial court and counsel should be guided by the points explained in Watson in determining the proper scope of any narration of the videos. In particular, the narration should be considered on a question-by-question basis and objections should be made accordingly. Watson, ___ N.J. Super. at ___ (slip op. at 85). The trial court can then make appropriate factual findings on the record concerning those objections.

We discern no error in the trial court's decision to admit the identifications of defendant based on the video and photographs taken from the deli. We also discern no error in the trial court's decision to allow Reading, Bolognini, and Manzo to make the identification both out of court and in court. As described

28

in this opinion, however, that identification cannot be directly linked to the individual seen to have exited the Sundance in the videos from the incident.

In terms of the sentence, the Supreme Court has recently clarified that mitigating factor fourteen does not apply retroactively. See State v. Lane, ___ N.J. ___, ___ (2022) (slip op. at 2). Because we are remanding for a new trial on other grounds, however, if defendant is convicted after a new trial, mitigating factor fourteen would apply because he would be subject to a new sentence. See id. at ___ n.3 (slip op. at 17, n.3).

F. Conclusion.

Because parts of Reading's narrative testimony were inadmissible and prejudicial, we reverse defendant's conviction and remand for further proceedings. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

29